**UNITED STATES of America,**
**Plaintiff,**

v.

**Claude S. GOSSETT and Katherine May Gossett, Defendants.**

**UNITED STATES of America,**
**Plaintiff,**

v.

**Charles D. WILLIAMS et al., Defendants.**

**Nos. 64-1758, 65-812.**

United States District Court
C. D. California.

Dec. 5, 1967.

Manuel L. Real, U. S. Atty., Thomas H. Coleman, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff.

**12**

Robert A. Stafford, Clarement, Cal., Schuman, Novak & Cooper, Beverly Hills, Cal., for defendants.

## COURT'S ORDER—PURSUANT TO PRETRIAL

WESTOVER, District Judge.

The above cases are representative of a number of actions filed by the Government against alleged trespassers who have located on land adjacent to the lower Colorado River.[1] Treating defendants as trespassers, plaintiff has brought actions in ejectment to recover possession of lands owned by the United States of America and for damages for unlawful use thereof. Defendants in each case allege that the property occupied by them does not belong to the United States but is in truth and reality property owned by the State of California.

Defendants in these actions are (as are the defendants in the related cases) trespassers—either upon land owned by the United States of America or upon land belonging to the State of California, to which land defendants assert no title.

Subsequent to the war between Mexico and the United States the treaty of Guadalupe Hidalgo was signed, by which Mexico ceded to the United States all of the vast territory north of the Rio Grande and Gila Rivers and all of Alta California. By the treaty, the United States of America became owner of all public lands embraced within such ceded territory, including the lands adjacent to and under the Colorado River.

 As, upon colonization, America had adopted as its basic law the common law of England, it followed that when western territories were formed into states and admitted into the Union, each state (by reason of the common law and the policy adopted by the federal government) became owner of the land under its navigable streams to the usual high water mark. Pollard v. Hagan, 3 How. 212, 44 U.S. 212, 11 L.Ed. 565.

Designation of the usual high water mark was confirmed in the "Submerged Lands Act of 1953", 67 U.S. Statutes at Large 29, which Act defined "lands beneath navigable waters" as

"(1) all lands within the boundaries of each of the respective States which are covered by nontidal waters that were navigable under the laws of the United States at the time such State became a member of the Union, or acquired sovereignty over such lands and waters thereafter, up to the ordinary high water mark as heretofore or hereafter modified by accretion, erosion, and reliction; * * * "

California's Constitution of 1849, describing the boundaries of the southern part of the state, is as follows:

" * * * ; thence running in a straight line in a south-easterly direction to the River Colorado, at a point where it intersects the 35th degree of north latitude; thence down the middle of the channel of said river, to the boundary line between the United States and Mexico, as established by the treaty of May 30th, 1848; * * *." Constitution of 1849, Article XII.

On September 9, 1850 California was admitted into the Union

" * * * on an equal footing with the original States in all respects whatever." (9 U.S. Statutes at Large 452.)

Pursuant to the rule, title to lands under navigable waters vested in the State of California, as such title to the respective lands beneath its navigable waters had vested in each state as admitted into the Union. United States v. California, 332 U.S. 19 at 42, 67 S.Ct. 1658, 91 L.Ed. 1889. And by Section 3 of 9 Stat., supra, the public lands within the borders of California were reserved for disposition by the United States.

In 1872 the California Legislature passed an Act which, signed by the Gov-

---

1. It is estimated that more than a thousand parcels of land up and down the Colorado River have been and are now occupied by trespassers.

ernor, became law—Civil Code § 830. It provides as follows:

"Except where the grant under which the land is held indicates a different intent, the owner of the upland * * * when it borders upon a navigable lake or stream, where there is no tide, * * * takes to the edge of the lake or stream, at low-water mark; * * *."

A basic problem in these ejectment cases is to determine whether the United States of America is the owner of the upland to the ordinary high- or low-water mark.

Court decisions indicate that although lands under navigable waters to the ordinary high-water mark were transferred to each state upon admission into the Union (United States v. State of Oregon, 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267), nevertheless, each state had the right to limit the extent of lands which it would receive.

In Hardin v. Shedd, 190 U.S. 508, page 519, 23 S.Ct. 685, 47 L.Ed. 1156, Mr. Justice Holmes, speaking of land bounded on navigable water, declared:

" * * * the land under the water does not belong to the United States, but has passed to the State by its admission to the Union. Nevertheless, it has become established almost without argument that * * * the effect of the grant on the title to adjoining submerged land will be determined by the law of the state where the land lies. * * *."

The Supreme Court of the United States, in Barney v. City of Keokuk, 94 U.S. 324, at page 338, 24 L.Ed. 224, said:

" * * *. Whether, as rules of property, it would now be safe to change these doctrines [doctrines of the several States with regard to ownership of the soil in navigable waters above tidewater] where they have been applied, * * * is for the several States themselves to determine. If they choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections. * * *."

■ Since enactment of California Civil Code § 830, it has been the law in California that the state's title to the lands under navigable streams extends only to the low-water mark.[2] Crews v. Johnson, 202 Cal.App.2d 256, 21 Cal.Rptr. 37; City of Los Angeles v. Aitken, 10 Cal.App.2d 460, 52 P.2d 585; 43 California Attorney General Opinions 291.

From time immemorial snows have fallen on the high mountains of Arizona, Utah, and Colorado, and in the spring of each year the melting snows have, through the centuries, rushed their way into brooks, creeks and streams which ultimately come together to form the Colorado River. Each spring brought its inundations and deluges of melting snows from the highlands into the Colorado and, by way of the Colorado River, eventually into the Gulf of California.

Rushing on its way to the sea, in the mountain areas the Colorado River carved out deep chasms, forming for itself a waterway between steep canyon walls; but when it emerged from the mountain country the river then poured through a series of valleys, bounded on either side by high plateaus or mesas, becoming in the full floods of spring a mighty river, flowing into many different channels.

Upon her admission into the Union on September 9, 1850, California became the owner of the land beneath the Colorado River as the river then flowed. Certainly the area of land owned by California could not depend upon the annual meanderings of the Colorado River nor upon the building of dams which control the boisterous Colorado in springtime. Hence, the Court is of the opinion that it is necessary to locate the main channel of the Colorado River on September 9, 1850 which will enable determination whether the land occupied by the defendants is within the low-water mark of the river.

2. California is not the only state to limit its title to low-water mark. United States v. Eldredge (D.C.Montana), 33 F.Supp. 337.

The Court is cognizant of the fact that this conclusion is contrary to that reached by the United States District Court of Arizona. In an unreported opinion in United States v. Claridge, 279 F.Supp. 87 (Findings of Fact, Conclusions of Law and Judgment filed in November, 1966) Honorable Walter Early Craig came to the conclusion that it was necessary to determine the channel of the Colorado River only at the time the grantees came into possession or from the date title was claimed. Judge Craig said:

> "While it is possible to view the area in question and to generally determine the historical movements of the river there are little, if any, physical characteristics from which one might determine the classical 'ordinary high water mark' of the river as it existed prior to 1935, nor is it in the opinion of the Court necessary to make such a determination to resolve the issues of this case."

And Judge Craig made the following Findings:

> "1. It is immaterial to determine the location of the ordinary high water mark of the river in 1912 [when Arizona was admitted into the Union] or subsequent dates, other than the date at which defendants claim title or right to possession.
>
> "2. The present ordinary high water mark of the river exists by virtue of the controlled flow of the river through Hoover Dam and other dams upstream from the lands in question.
>
> "3. The lands in question are located to the east of the present ordinary high water mark of the Colorado River." [3]

■■ The location of the low water mark at the time of California's admission into the Union must be determined in these ejectment cases. It is inescapable that California is a necessary party to these proceedings. If determination is to be made of the line between the land owned by the United States of America

and that owned by the State of California, the State should participate in the establishment of its boundary line.

These cases come before the Court upon pretrial; therefore,

It is ordered that the State of California be made a party in these actions;

That the issues to be tried by the Court are as follows:

1. Location of the main channel of the Colorado River on September 9, 1850, when California was admitted into the Union.

2. Location of the "ordinary low-water mark" of the Colorado River on September 9, 1850.

3. Situs of defendants' property with reference to the low-water mark.

4. The effect of erosion, accretion, avulsion and reliction on the property upon which each defendant has placed himself.

---

3. In Arizona the title of the State extends to the ordinary high water mark; where-

as in California the State's title is to the ordinary low-water mark.